Good afternoon. May it please the court, my name is Matthew Monfortin. I have the honor and privilege of representing appellant Mark French. He and his family are present in the courtroom today. And with me at council table is Professor Eugene Bullock, as well as Elizabeth Arias. And with the court's permission, we would, Ms. Arias and I would like to ask that our 20 minutes of time be divided, 10 minutes for her, 10 minutes for myself. I'd also like to ask that 5 minutes of my time be reserved for rebuttal. Thank you, Your Honor. Because Rule 4.1A.7 of the Montana Judicial Code is a content-based restriction subject to strict scrutiny, the state has the burden of proving that it's narrowly tailored to achieve a compelling state interest. The state cannot meet that burden for a number of reasons, not the least of which is because the rule has the same kind of under-inclusiveness defects as the Minnesota rule that was at issue in Republican Party of Minnesota v. White. Which one? One or two? Oh, it would be White 1, the U.S. Supreme Court case. For example, the rule is under-inclusive because it allows candidates to use and solicit endorsements from all groups except political parties. Counsel, may I ask you this? We've obviously got four cases that are probably not very reconcilable. You've got Sanders, you've got the Republican Party v. Minnesota 1 and 2, you've got, I'll treat you as one, you've got Wolfson, and you've got Williams-Yule v. Florida Bar. How do you reconcile those cases? Are they reconcilable? Well, we believe that Williams-Yule is distinguishable because in that case, the speech restriction that was at issue involved only a partial ban on solicitations or a ban on direct solicitations. The Supreme Court made it clear that it was allowing indirect solicitations and therefore it was a very minimal intrusion on free speech. In this case, the rule at issue here prevents judicial candidates from using political party endorsements at all. They can't use them directly. Their campaign committees can't use them indirectly. It's a far more burdensome rule. But with respect, Counsel, if I understand the record correctly, there are just all kinds of things that a judicial candidate can do here. They can, you know, they can get money from judges. They can get, they can have endorsements prior to a judicial campaign. I mean that you know the list as well as I do, probably much better. The reality is there are just lots and lots of exceptions. This is fairly narrow. You've got what the state claimed is a very important interest and that is the integrity of the judiciary. What's wrong with that? The problem, Your Honor, is that my client wants to be able to tell the voters about his political and legal views and that he shares those political, the same political and legal views that the Republican Party has. But can't he do that? Can't he say all of those opinions that he has without maybe being able to shortcut it by saying, and the Democrats endorse me? I mean, can't he essentially state all of those viewpoints and values without packaging them in this way? Yes, Your Honor. He can say that. He can say, I believe in the values of the Republican Party and look at their platform. Those are my values. He can say that himself. The problem is that doesn't have the same kind of credibility, especially with voters today, unless he can say, oh, and by the way, the Republican Party in Sanders County has reviewed me. They've reviewed my track record and they agree with me. But the Republican Party can say that. Yes. Yes, Your Honor. The Republican Party can say that independently, but it's my client who wants to be able to broadcast that. He wants to be able to tell the voters as he's knocking on doors, as he's putting out campaign literature, not only am I not only am I saying that I'm a conservative, but the Republican Party has has reviewed my record and they agree with me. That bolsters that his statements and his campaign, his campaign statements immeasurably. For him to not be able to do that takes away some of the credibility, a lot of the credibility a statement would normally have. Today, we know Mr. Volokh is an expert in First Amendment law and he's written a lot about Internet and social media and so on. Why can't the Republican Party, as an example, the Democratic Party send out a blast to all its people saying this guy or this woman is the best judge could possibly be. We just endorse him. I think he's absolutely fabulous. And today, we seem to be segregating ourselves in society based upon whose tweet list we're on or an email setting, the old traditional ways of notifying people like with placards and so on. It seems quite old-fashioned. Isn't this such a minimal restriction given the advent of social media that it's almost meaningless? The problem, Your Honor, is that a lot of the voters that Mr. French wants to reach in Sanders County are not 20-year-olds, 25-year-olds who are Internet savvy. They tend to be elderly citizens who are not so Internet savvy. These are all judges, probably? Well, and the other problem, the bigger problem that we have in Montana is that there's no party registration. There's no list, there's no email list of Republicans that Mr. French can blast that out to or that the Republican Party can blast out to and say Mr. French is our guy, vote for him. So there are significant disadvantages to Mr. French's campaign if he's not able to talk about the fact that the party agrees with him, the party has vetted him, and that... Our role in trying to, if you will, make these cases fit with one another, we have to weigh... Everybody agrees that the restriction on speech, the question is whether the state meets strict scrutiny. So we're balancing, as I see it, the strength of the state's objective, which they state is the integrity of the judiciary, versus the reality in my view of how limited the restriction really is. And I really do take the social media concept as an important one. I think it probably played a huge role in our most recent presidential election, whether one likes it or not. And I find it, I just, I'm wondering whether your argument is a realistic one. Can you help me? What am I missing here? One of the things that I think needs to be pointed out is that the state claims that they have this compelling interest of preserving public confidence in the judiciary, but there's really no basis to say that the use of party endorsements somehow diminishes that. The public expects... Who gets to decide that? This is the legislature, right? Well, it's actually the Montana Supreme Court that promulgated these rules. Okay. But the state has a right... Are they elected judges? They're elected judges, your honor. So in effect, they're politicians in black robes. They're the kind of folks that want to be able to say, that want to be able to limit the ability of challengers to get their message out. And that's part of the problem. The other part of the problem is that the Montana Supreme Court, in promulgating these rules, has conflated elections with campaigns. The state has a right to control the mechanics of an election. They can say, we're going to have ballots that don't have party identifiers. Mr. French is not challenging that. But what this rule does is it goes much further. It doesn't just simply regulate elections, it regulates candidates' campaigns by telling them what they can and can't say about themselves. And that's a far more serious intrusion on First Amendment. There's only one thing they can't say. I'm a Democrat. And it's one of the most... But it's one of the most important things that they want to be able to say, and more importantly, that the voters want to be able to hear. Because frankly, voters don't have a whole lot of time to spend on researching candidates for justice of the peace. So does the rule that you're proposing today mean that Montana eventually will have to list on the ballot the party affiliation of any candidate who wishes it listed? No, Your Honor. Where's the stopping point then? The state has a right to arrange the ballot any way it wants within reason. And there have been cases that have held that the states have that right. We're not challenging the idea that the ballots are omitting party identifiers. We don't have a problem with that. Mr. French simply wants to be able to go out on his own and to be able to talk to his voters and tell them the things that he thinks that are important for him being elected. I noticed that my time is rapidly diminishing. It's gone. So I will allow time for rebuttal. Thank you, Your Honor. Good afternoon, Your Honors. My name is Elizabeth Arias, and I'm here on behalf of Center for Justice. And I have a question posed at the outset of the argument about whether or not the four cases at issue are reconcilable with one another. And I would argue that they are absolutely reconcilable. So what the court said in white was... You think that Wolfson follows from White 1? Our court could have figured out Wolfson by reading White 1? Well, Wolfson, yes, was dependent on Williams U. Lee, but Williams U. Lee... A little bit or a lot? A lot. But the two, Williams U. Lee and White, can absolutely be reconciled with one another. What the court made clear in white was the candidates need to be free to discuss their qualifications for office. The speech and debate that occurs about who's running for office and why they're qualified to be voted into office is core political speech. What isn't core political speech is asking for money, which the court in Williams U. Lee said, we can move this to the campaign committee because it isn't really speaking as directly to the individual's qualifications for office. But here we have speech that speaks directly to an individual's qualifications for office, whether or not they're endorsed by a party. And that is extremely distinct from whether or not they are a member of a party. To say that you're endorsed by a party is telling the public that this party, who is a repeat player in elections, has a lot of legitimacy with the people, has looked at your qualifications, has vetted you, and has said this person is qualified for this office and this person subscribes to a set of beliefs that we also subscribe to. And in that way, judicial candidates are communicating to the public, I'm a qualified candidate, you should vote me in. And there's just really no other way for them to say that. So when Montana tells candidates... What do you base that? You're a smart person, obviously. But the Montana Supreme Court has said, you know, we've evaluated this, and we have to deal with these judges. And we're concerned that people view the judicial process as a political process. And some recent national things have suggested that, because we have some so-called judges in this area, apparently. So given that fact, isn't it important to defer to the people who head the judicial system in Montana to evaluate, in their considered opinion, whether this narrow restriction, allowing all the other things that they can do, the candidate can do, to try to promote judicial integrity? Why don't we refer to them rather than the candidate? Well, Your Honor, because this is a content-based restriction. So it's the state's burden to meet strict scrutiny. And so we can't just defer to, well, we say we need this. But it's part of how the state meets its burden, though, isn't it? We're saying that the justices met together and they decided, this is a very important rule, we're going to promulgate that, because we're very concerned about judicial integrity. Do we just, ipso facto, say, well, that doesn't mean anything? Or is that, in fact, part of the state's argument that it does meet strict scrutiny? Well, Your Honor, I think that we can give some credit to the fact that these judges think that, but that certainly can't be enough. Because in that case, then they could say, well, we think that this is necessary to meet this compelling interest, and that would just give them the ability to restrict all sorts of speech. And that couldn't possibly be the right outcome. So we need to look and look at the facts on the ground and say, is this actually narrowly tailored? And the fit between the preserving the integrity of the judiciary and this massive restriction on speech just isn't really there. Why is this a massive restriction? We talked earlier about all the things that the candidate can do, ways to communicate, you know, saying, the candidate can say, I'm a Democrat. Hey, look, here I am, I'm a Democrat, I got a big D, you know, you know me, I'm a Democrat. Right. Why doesn't that give the person plenty of leeway, all the other things that can be done? And before the campaign, they can say it openly, no problem. I guess what I'm struggling with is, who gets to decide? I know, ultimately, we do, but we have to look at what's actually happening on the ground, how much of a restriction this is. And that's frankly what I'm struggling with. I don't find this very narrow restriction compared to what the integrity of the judiciary to be all that much in equipoise. So, Your Honor, to answer your question in two parts. First is that this is a pretty big restriction. If we think about it, if you're applying for a job, but you're not allowed to tell people who your references are and have people come in and say, yeah, this person's good, we stand behind this person. You can say whatever you want on your resume, but you don't really have that force of credibility behind you. And that is really important in an election, especially even if the person that your recommendation you want is saying across the street with a saying, we think is great. Or sending letters of recommendation into the prospective employer, essentially. Right. So the difference between that and the ability to speak on your own behalf, to explain to the public why you're qualified. Mr. French can't depend on the Republican Party to speak up for him. He can hope that they do. But when he's looking to win the election, he can only speak on behalf of himself. And their interests are different than his interests. Is he barred from coordinating with the Republican Party in this example that you gave? Yes. He's not allowed to seek endorsements. And the other point that we're getting at with all this is there's lots of different ways that this connection between the political speech and the judicial elections is going on. So the idea that this advances this compelling state interest is a little bit suspect, because like you said, the Republican Party can send out the blast, or he can say, I am a Democrat. So the idea that now the public is going to think that, these people are completely free of all partisan influences, is just it's not really pushed by. Does the rule forbid a candidate from ascribing political affiliation to his opponent? I do not believe so, but I'm not certain. So I'm looking at A7. It doesn't look like it comes four square there. But is Mr. French prohibited from saying, my opponent is a gall-durn Democrat. And he follows the Democratic Party, not only in Montana, but here's a whole list of objectionable Democrats from California and Washington, D.C. and other places. And if you elect him, that's who you're getting. No, I don't believe he's prevented from saying that at all. So you think that that's under the rules, that the candidates can do that today? Yes, that is correct. And once again, that goes to show... Even though they're prohibited from saying something about themselves, they can say something about the party affiliation of their opponent? So they can say their own party affiliation. What they can't say is, I'm endorsed by the Republican Party, which... In what way can they reveal that they're Republican? So I don't think that they're... Or a Democrat. So they can just say, I am a member of the Democrat Party, if they are, but they can't say that they have been endorsed. And they put it on their sign? I don't believe so. But they can... I can't say that the rule is so clear that I can tell that from looking at 4.187. I'm actually not sure either, but I know that the state can't stop them completely from identifying their political party as private citizens. If they can do that, then Mr. French can say, vote for French, and he can put underneath Republican. But he can't say the Republican Party endorsed me. No, but he could say Republican on the sign? Yes, Your Honor, but there's a dramatic difference between I'm a Republican and the Republican Party endorsed me. I could be doing all of these things that were completely antithetical to the Republican's platform and be a completely unqualified candidate and say, I'm a Republican, but I'm only going to get that endorsement if I prove to the Republican Party that I deserve it. Counsel, with respect, I've seen lots of signs over the years, and I don't remember any emphasis about endorsement by a party. They put R or D or whatever it happens to be, and people just assume that they're a Republican or a Democrat. What difference does it make whether they are officially endorsed? Isn't this just another one of these minutia that it's very easy to get around? And when you get it all together, this is not much of a restriction. Just to be clear, Your Honor, I'm not certain that they would be able to say Republican on their sign because that might be misleading. And so the Montana might say that this violates this restriction. Even if they can't, what about what my colleague said? If they can say, you know, my opponent, Joe, whoever, is a cauldron, whatever, you know, that's pretty clear, you know, he stands for all these things. The negative pregnant of that is, well, I'm just the other side and I do other things. That's not enough. It's not enough, Your Honor, because when you say you're endorsed by someone, someone's giving you their stamp of approval. You can say whatever you want about yourself, but there's nothing people do. Exactly. But that's that's what brings the legitimacy in with the party. We know that people are going to say whatever people put whatever they want out there. But once the party who's a repeat player, a legitimate actor, somebody that people an actor that people trust says this is the guy. We have to believe that people know what a party stands for. I'm a member of a particular party. I have no idea what it stands for today. I have no idea. Is that true of other people? I would say that most people have a general sense of what. I sure don't. And does that make a difference in this situation? Well, I don't think that it does, because I do think that there are certain, maybe even if we just go as broad as more conservative, more liberal, that people could say, OK, but there's no there's no bar under this regulation to say I'm a conservative or I'm a liberal, right? Right. But there's a bar to say that you're endorsed by the conservative group or the liberal. But if I'm endorsed by the Republican Party in New York City, it's very different than if I'm endorsed by the Republican Party in Ketchum, Idaho. Right. Yes, your honor. But the other point is that the party is not going to endorse somebody who's unqualified, somebody who doesn't have the. I don't think so. I don't don't answer that. Don't instructing counsel not to answer the question. I think that if we look at a broad scope of most endorsements, the party takes its role very seriously. And it's not going to endorse someone that it doesn't think deserves to be a judge, especially in something like a judicial candidate where people do not know very much about judicial candidates. They don't take they don't have the time or the resources to research qualifications, job history, education, background, and make an educated decision themselves. They use the party as a shorthand. They rely on the party to say, OK, we're endorsing this person. And that's why when you're running for office and you're trying to explain to the public why you're the best candidate, why you're the most qualified, this core protected political speech, you need to be able to tell them I'm endorsed by the Republican Party because that boosts your resume in a way that no other speech can. Thank you, Ms. Arias. Thank you, Your Honor. Let's hear from the state. Good afternoon, Your Honors. My name is Dale Schoengerdt. I'm with the Montana Attorney General's Office, and I represent the appellees in this case, the commissioners on judicial standards. May it please the court. Let me just ask this question right off the bat. The commissioners on judicial standards, is that the Montana Supreme Court or is it somebody else? It's not a collection of it's judges in Montana that serve on the on the commissioners. So they are the elected judges appoint the commissioners on this commission. Correct. And the rules themselves were adopted by the Montana Supreme Court. So, yeah, Williams-Yu Lee and this court's en banc decision and Wolfson control this case. And I think dictate that the- And are they irreconcilable with White One? I don't think they are. I think pre, before Williams-Yu Lee, I think people assumed that White One applied anytime you had a judicial speech. Williams-Yu Lee clarified that and especially Wolfson. Well, White One is limited to a very specific context. It's limited to when judges speak about their qualifications for office. And that's something the court in Wolfson discusses on page 1176 and notes that the Eighth Circuit and the Sixth Circuit and the Seventh Circuit have held likewise that it's a limited context for White One. Williams-Yu Lee was a game changer. And you see this, the difference between the Wolfson panel decision and the Wolfson en banc decision. That's how much things changed because I think people were assuming that White One applied. Williams-Yu Lee clarified that the under-inclusive analysis that plaintiffs were making and that plaintiffs make here is not valid when you're talking about the broad interest at issue in judicial integrity. And especially protecting, the first issue is that judges or the state has a compelling interest in protecting the public confidence that judges make their decisions based on law and not partisanship. Counsel, I've got just a couple of sort of basic questions about the scope of the law. So is it true that a candidate can list on the sign that he or she is a Republican? Probably not list on the sign. There's a separate statute that the plaintiffs didn't challenge that prohibit candidates from implying that they are the nominee of a party. Okay. But can they just say registered Republican? Yes. They can say, if they're giving a speech, they can say that they're a Republican. They can say they're a Democrat. They can, you know, the state understands. They can say that. They can say their party. It does not prohibit revealing party membership. And this is a distinction from the Seifert case out of the, I believe the seventh circuit. And in fact, that case noted that it's less restrictive to say, to prohibit party endorsement because that's what the state is concerned about. And so then they also can refer to the imputed political party of their opponent as well. Somebody's been a registered Democrat, or everybody knows that he ran for the city council 10 years ago as a Democrat, or somebody surely espouses democratic principles and therefore is unqualified for judicial office. There's nothing in the rule that prohibits that. And so what the rule prohibits is endorsement. That's what it's concerned about is party endorsement and candidate endorsement, because first of all, the state understands that people come to run for the bench with political backgrounds. Everybody has a political background. So it's not trying to hide the obvious, but what it wants to avoid is the association that people make that if this person is endorsed by the political party, if they've sought out the endorsement, and if they're using that in their campaign materials, they're either a red robe judge or blue robe judge. That's what the state wants to avoid. And it's also quite possible that you would have a situation in which you had two red robed or two blue robed candidates running against each other. That is possible. In our recent history, that hasn't been the case, but that certainly could be. But I think the interest holds the same, whether that's the case or not. The state is trying to avoid people seeing judges in partisan terms because they're not politicians. And Justice Roberts made this point in his confirmation hearings, and he made it in Williams v. Yulee, that judges aren't— Aren't they umpires? They're supposed to be umpires, Your Honor. And the reason they're not politicians is because judges can't make promises. They can't adopt party platforms. They don't get elected on that basis, and that distinguishes them from typical politicians. And I also want to clarify, this is not something that came out in 2008. This has been a longstanding part of Montana judicial elections. If you're familiar with our history, the early territorial days were marked by vigilantism and extreme distrust in appointed territorial judges. And the reason was that those judges were in the pockets of mining interests and powerful politicians and political parties. And so in 1909, the state enacted an elected, nonpartisan judiciary. And in 1935, it enacted more comprehensive measures to put that into place, which included prohibiting or restricting partisan endorsements in judicial races. But what role does that—I mean, obviously, the strict scrutiny that we deal with today wasn't really around then. So how are we to factor that in? I mean, to me, it looks like this is just a piece of giant Swiss cheese. There's hardly any content to it. I get the history. I get the reasoning for it. But it really doesn't impose much of a burden from my perspective. We need to find, if we're going to uphold this, that this is a valid state interest and that this validly upholds that or helps to uphold it. Is there any evidence in the record that could help us see in what way, on the ground, this actually upholds the integrity of the judiciary? Well, I think the fact that this has been in place for over 80 years, it's hard to say what it would be without it. I mean, this is— Well, there are lots of rules that say you can only have so much on the back of a railroad car. And that has been in place for years. And you've got mudflap rules. And the fact that they've been there for a long time doesn't mean that they're right, does it? No. But I think the health of our elections is evidenced in the Chief Justice's brief, cites at page 19, that partisanship is the biggest threat, and according to polling, is the biggest threat to public perception of the integrity of the judiciary. And so this is a fundamental issue. The Supreme Court in the mistreat of the United States said that the legitimacy of the judicial branch depends on the public viewing judges as nonpartisan. So I think that the breadth and the importance of the interest at issue here can't be understated. And I think that was the point of Williams-Yu Lee. And that's certainly what Wolfson recognized, that this is not a novel issue. This is not a novel, compelling interest. This is one that's well-established and of extreme importance. But there are so many ways that a candidate can get the message out that he or she is a member of a particular party. Just so many ways. Right. Like, for example, if you have a local union leader who said, I've known Joe forever. Went to grade school together. We've both been in a lot of Democratic rallies together, and we both believe the same principles. He can go around and talk all he wants. It's not a problem. Guy can say, you know, I'm a registered Democrat. The endorsement concept that that somehow is this shibboleth that solves all these problems or stops all these problems, it's really hard for me to swallow. If I don't just say, arguendo, if I don't believe that it has any real impact, what role, if any, should that play in my analysis? So I just have to defer to the justices? I think the court in Williams v. Lee and Wolfson said that you do have to give some deference to the considered judgment of the state that's living under these rules. Not all states are the same. For example, in Williams v. Lee, Florida banned solicitations, in-person solicitations or any solicitations by the judge. A lot of states don't have that rule, including Montana. The court noted that and said that does not undermine the state's interest because there's deference to the considered judgment of a state's requirements based on its own history and electorate. And that's something, when we're talking about endorsements, that's what's been important in our history for the last 80 years. It's been a foundational part of our judicial elections. And the reason I think is endorsements are different as far as our state is concerned, because the recognition that endorsements are a unique political currency in and of itself. It's trade. Endorsements are not given away for free. They're traded for promises. And that's what Judge Easterbrook recognized in the Seventh Circuit. So the judge can say, if you'll give me your endorsement, I'll rule in such and such a way in different kinds of cases. Well, I don't think that's okay. In fact, that's what the state's trying to prevent. That's both that reality and the public perception that that's the reality. What did you mean then by the concept that these endorsements are not for free? You've got to bargain for them. What's the bargain? What's the price? Well, typically, and this is what the state's trying to avoid. The bargain is promise to vote for a party platform, promise to do certain things. Well, the endorsement is still there, because the Republican Party can come forward. The Democratic Party can come and say, here's the judicial candidates that all good Democrats will be supporting. The difference is that the candidate didn't seek that out. He didn't. He's not promoting it. And that's in the public side. The rule only applies to promoting it, right? Does it say that the party, that he can't talk to the party about it? He can't seek it. He can't accept it. And he can't promote it. And this is all in A7? A7, yeah. So it prohibits all three of those things. And the reason is because the identity, as William Julie said, the identity of the speaker matters, the identity of the solicitor. So if it's the candidate himself or herself that is seeking that endorsement, promoting that endorsement, that makes a difference. People expect political parties to be partisan. That's what they are. It doesn't expect, it expects judges not to be. And so that's the distinction. And I think that's why it makes a real difference. What role does the vast number of exceptions and other ways to communicate the very thing you're talking about? What difference does that make in our analysis of whether this, in fact, advances the stated state objective to preserve judicial integrity? I think it shows that it's narrowly tailored, Judge Smith. Which, of course, is a requirement restriction. That's right. It's showing. And I don't know that Mr. French really has much argument with that. Page 14 of his brief, the only more narrowly tailored restriction he offers is having an appointed judiciary. William Julie rejected that as a valid choice for a state or a valid requirement that they have an all or nothing choice here. But I think what that does show is this is about as narrowly tailored as it can be. It's focused on the state's direct interest. And as you noted, Judge Smith, there are lots of other ways that judges can talk, they can speak about their qualifications. They can speak about disputed political issues and legal issues. They can engage with the electorate in all sorts of ways. They just can't seek, use, and accept an endorsement. And under the rule, can a judicial candidate get, in this case, say, a prominent member of the bar to go around and if they say, well, boy, our Republican or the Democratic Party really thinks this person's great, think they're wonderful, can they do that? No. The rule prohibits the candidate to do by proxy what he couldn't do himself. What if he does like these campaign committees that, of course, have no contact with the candidates but obviously do, if there's no proven coordination, is that okay? In other words, the candidate as a good friend, of course, they don't talk about this, but the friend's out there talking about what a great Democrat this person is. And the party just loves him, thinks he's great. I think if somebody is doing that, people can certainly speak independently. They can spend money independently on a candidate, and they do in Montana. But one facet of Montana judicial elections, frankly, even after Sanders County, parties still, I don't know, I'm sure they have endorsed judicial candidates, but it doesn't happen very much. I mean, Montanans like non-partisan judicial elections. Not only has it been a part of our history, but it's something I think people generally think is important to the health of the judiciary. Can we focus on Sanders County for just a second? Sure. Is it your position that Wolfson effectively overruled it or that we can ignore it? How do you square Sanders County with what happened in Wolfson and Williams-Ulee? What do we do with it? I think there are some factual distinctions. There are a couple of distinctions I'd like to make, but it's hard to say that it wasn't significantly undermined, especially the under-inclusive analysis, which Wolfson and Williams-Ulee explicitly rejected that analysis. The argument that the state's only choice is to go to an appointed judiciary rather than an elected judiciary. And so I think it's tough to reconcile, and sort of the breadth of the interest involved. Interestingly enough, in Williams-Ulee, the court said Williams-Ulee didn't want to personally solicit somebody for a donation. She wanted to engage in mass mailings and internet discussion. The court said, well, that may not be as important as an in-person solicitation, but it still implicates the state's interest in judicial integrity. And that was the difference. And Wolfson made the same point. That's something that I think Sanders County probably took, if you look at the case, it took a too narrow view of the state's compelling interest. And that's what Williams-Ulee clarified, that it's very broad and very important. Factually, it was also a criminal case. And so the court noted that when you've got a criminal case, that's the penalty for abridgment of free speech. That puts it at the absolute height of protection. Two, it was a third party speaking. And that makes, I think, a critical difference as well. I mean, it was political parties. And like I said earlier, political parties, everybody expects them to be partisan to speak. So the state's interest isn't quite as high when it is the candidate himself or herself. This is the idea that we have different systems is a matter of our federal system. It's an important part that states are allowed to develop systems for their judges. And the reason is that judges are unique. I mean, courts play a unique role in our democracy. And when two warring parties come to the court with a case, the judge makes a decision, the losing side abides by it. But the system only works if the public has respect for the judges and has respect that judges are making those decisions on the law and the facts, not partisanship. And so that's something that Montana and the lesson Montana learned early in our history. And it's something that we preserved to the current day. We'd ask that you uphold the district court. Thank you. Thank you, counsel. Mr. Monfortin. Thank you, Your Honor. I'll be brief. I first want to address an issue that you raised a few moments ago, Judge Bybee, about whether judicial candidates can talk about the fact that they're affiliated with the party. The answer is they cannot. Section 13-10-602, paragraph 2 of the Montana Code. Hold on a second. I'm sorry. What? It's section 13-10-602, subparagraph 2 of the Montana Code annotated, strictly prohibits candidates who are in nonpartisan races, including judicial candidates. And the terminology that's used in the statute is you can't use the party name in your candidacy. So they can't use the, Mr. French can't use the Republican party name in his signs, in his radio advertisements. When he's knocking on doors, he can't use that information at all. So what was said earlier was inaccurate, right? Yes, Your Honor. And I don't think it was anyone's fault. Not in any bad will or anything like that. But for our purposes, we should understand that you cannot use it on your sign or say, I'm a Democrat. Exactly. Exactly. And I'm quoting that section from memory. So if it's 603 instead of 602, please indulge me on that. And you're not challenging the constitutionality of 13-10-602? Well, there is a separate case that is concluded in which we are challenging that, it's a different case and a different client. But that's also one that may be coming up in the not too distant future. There's another inclusive issue that I want to speak about very briefly. The statute, the rule bans soliciting verbal endorsements from public officials, but doesn't ban soliciting monetary contributions from public officials. Monetary contributions are the ultimate form of endorsement. And for the state to ban solicitation of verbal endorsements without banning solicitations of monetary contributions makes no sense. And why is that? Because it's going to be reported someplace and people will figure it out? Yes. If the contribution is over $35, the judicial candidate must report that contribution. So it makes no sense for the state to say, you can't ask a public official for a verbal endorsement, but you can go ahead and ask them for $100, $200, $300. Certainly not terribly accessible for ordinary people. It's the information is online. It's actually quite accessible. But it's not the kind of thing, it's not as easily available as having the candidate himself or being able to post it on signs. Perhaps, but it's still easily accessible that the sheriff gave $100 to a candidate, but Mr. French can't ask the sheriff for his verbal endorsement. And it simply makes no sense. But you and your co-counsel, one of you made the point that there are a lot of older people out there who don't use the internet, so they wouldn't have that information available, right? Just the young people. The young people and the savvier older people would have that information as well. What's your response to your opposing counsel's comment that the huge number of exceptions here merely emphasize the narrow tailoring that this particular restriction provides? The exceptions in terms of the ability of third parties to... Exactly, there's so many ways to communicate the message. The state was really trying to minimize its impact on this. It's very narrowly tailored. It's a legitimate state interest. What's your comment on that? The problem is that oftentimes in campaigns, especially local campaigns, if you're the candidate, you're pretty much a one-person show. There may not be union officials, friends, relatives... I understand that may be the case, but the reality is there's no bar to these other folks being involved and using these other methods. Doesn't the fact that you have these wide alternative ways of communicating argue in favor of your opponent's concept that the restriction that is there is narrowly tailored? It does not, Your Honor, because the main communicator, especially for local campaigns, is the local candidate. Mr. French cannot rely on the fact that the Republican Party or his friends or his relatives are going to go door knocking, go blasting out emails on his behalf. They might, and hopefully they will, but ultimately he's the one that has to depend on himself to be able to get that information out. And he can't do it. He can't do it. If he's French, you can have Mr. McCone help him. That one went over my head, Your Honor. I'm sorry. He's the new president of France. I'm sorry about that. Oh, okay, okay. I know I'm over my time. I will briefly summarize. The state is seeking nonpartisan judicial campaigns in which candidates harbor no partisan leanings. And that's simply unrealistic. In doing so, the state is promoting what amounts to a charade. Candidates, judicial candidates have partisan leanings. They have partisan views. The First Amendment prevents the state from forcing my client to participate in that charade by not talking about political party endorsements. For that reason, for the other reasons that we've talked about today, we respectfully request that this court reverse the judgment of the district court and enjoin enforcement of Rule 4.1A7. Thank you. Thank you, Mr. Montfort. I want to thank all counsel in this case. It's a complicated case. It's been complicated by some, perhaps, misdirection on the part of the Supreme Court. Certainly, it's a complicated case, but I think it was very well argued. Oftentimes, we don't acknowledge students when they are not representing a party, but are amici. But Ms. Arias, this was very nicely done. And I hope you realize how fortunate you are in a big case to have had a professor give you his argument with that. The court has completed its oral argument calendar for the week, and we are adjourned.
judges: Bybee, M. Smith, Dorsey